Wm. S. Pitcairn Corp. *v.* United States (No. 4663)[1]

[1] C. A. D. 458.

United States Court of Customs and Patent Appeals, June 5, 1951

*B. A. Levett* (*Meyer Ohlbaum* of counsel) for appellant.

*David N. Edelstein*, Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel), for the United States.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges

GARRETT, Chief Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Third Division, overruling the protest of the importer whereby recovery is sought of a portion of the duties assessed and collected at the port of New York City on certain (1) earthen and (2) china, or porcelain, figures, often called figurines or statuettes, imported from England. Certain types of clay form the basic ingredients of the articles which have no utility, having been designed for purely ornamental purposes. They are hereinafter more particularly described with respect to their creation, composition and what they represent. Since they fall squarely within the dictionary definitions of figurine we shall usually so designate them. All are embraced within the term ceramics.

The earthen figurines of the first type were classified under paragraph 211 of the Tariff Act of 1930, with duty assessment at 10 cents per dozen pieces and 50 per centum ad valorem, and those of the second type, composed of china or porcelain, under paragraph 212 of that act as modified by the reciprocal trade agreement with the United Kingdom, T. D. 49753, 74 Treas. Dec. 253, 263, with duty assessment at 45 per centum ad valorem.

The pertinent provisions of the respective paragraphs read:

Par. 211. Earthenware and crockery ware composed of a nonvitrified absorbent body, including white granite and semiporcelain earthenware, and cream-colored ware, terra cotta, and stoneware, including * * * statues, statuettes, * * * and all other articles composed wholly or in chief value of such ware; * * * painted, colored, tinted, stained, enameled, gilded, printed, ornamented, or decorated in any manner, and manufactures in chief value of such ware, not specially provided for, 10 cents per dozen pieces and 50 per centum ad valorem.

Par. 212. [as modified by the trade agreement with the United Kingdom, T. D. 49753.] China, porcelain, and other vitrified wares, including chemical porcelain ware, composed of a vitrified nonabsorbent body which when broken shows a vitrified or vitreous, or semivitrified or semivitreous fracture, and all bisque and parian wares, including * * * statues, statuettes, * * * and all other articles composed wholly or in chief value of such ware (except sanitary ware and parts and fittings therefor); any of the foregoing containing 25 per centum or more of calcined bone:

*       *       *       *       *       *       *

Painted, colored, tinted, stained, enameled, gilded, printed, or ornamented or decorated in any manner, and manufactures in chief value of such ware, not specially provided for:

*       *       *       *       *       *       *

Other_____45% ad val.

The claim on behalf of appellant is that both classes of figurines are subject to duty assessment at only 20 per dentum ad valorem, because classifiable under paragraph 1547 (a) [of the 1930 Tariff Act,—specifically under that clause of the paragraph which reads:

Par. 1547. (a) Works of art, including * * * statuary, sculptures, or copies, replicas, or reproductions thereof, valued at not less than $2.50, * * *, not specially provided for, 20 per centum ad valorem.

At the outset we are confronted by a disagreement of counsel with respect to the scope of the issue before us. This, we think, can be better understood after the facts are recited.

Much evidence was introduced on behalf of both parties, including exhibits illustrative of the merchandise, the testimony of numerous witnesses and some documentary exhibits.

The brief on behalf of the Government quotes the factual digest made by the trial court in its findings of fact, stating that it is "complete and impartial." Counsel for appellee, while disagreeing with the court's finding of law, does not question its findings of fact, and we avail ourselves of what we regard as a most able statement by quoting it verbatim.

It is long but no longer than clarity requires. It reads:

### Factual Digest by the Trial Court

At the trial 18 samples of the merchandise were received in evidence (plaintiff's exhibits 1 to 18). It was stipulated that such articles—
* * * are true samples of, and respectively represent in all respects, all figures wherever so described or designated on the invoices accompanying the entries covered by the above numbered protest and may be received in evidence as such samples and marked respectively as plaintiff's exhibits 1 to 18.

It is further stipulated and agreed that such samples may be so received as representative as to character, material, process of manufacture, and identical in other respects, except as to size, value, design and subject matter, of all figures covered by the above numbered protest and described or designated on the invoices accompanying said protest as "figures," irrespective of any particular name and number under which such figures may be designated on said invoices.

There were received in evidence the deposition of Leslie Harradine (plaintiff's exhibit 20), the deposition of Frederick Thomas Daws (plaintiff's exhibit 21), and the depositions of Cecil J. Noke and of the individuals who painted the figures before the court (plaintiff's exhibit 22).

Cecil J. Noke stated in his deposition that he is the art director of Doulton Co., Limited (hereinafter called Doulton), and has held that position for 12 years; that Doulton produces bone china and earthenware figures, tableware, vases, and decorative lines; that he is responsible for the production and designing of all patterns for such articles; that he is responsible for all new models, both figures and animals, for the coloring, and for all details attached thereto; that he was trained through schools of art which he attended while in the employ of Doulton; that he is familiar with all the processes by which the figures involved herein were produced at the factory; that he is responsible for the designing, making, and coloring of all figures produced by Doulton. He described the process by which the figures are made as follows:

The designs are originated by the artist-designer on paper or in clay—according to his individual method of working—a working model is prepared in plastic clay.

From the working model a set of master moulds is made in plaster of Paris. One mould does not suffice, of course, for a complete figure; it would be impossible to remove it. The figure has to be cut up in a number of separate pieces, for each of which a separate mould is made. Each dissected part of the model must fit perfectly when the various pieces are finally assembled. Each mould is used only a limited number of times and is then replaced—one reason why all Doulton figures are indistinguishable in exactitude of detail from the original model. Subsequent copies of the model are made by a process known as slip-casting. A liquid mixture of specially prepared clays and other ingredients is poured into each separate mould.

The porous plaster absorbs the water and the inner surfaces of the moulds gradually become lined with a coating of "set clay." The filling of the moulds is done by figure-makers, each one a seasoned veteran at his or her job, knowing just how long the "slip" (or liquid clay) should be left in the moulds in order that the casting may have the right thickness and strength. At the proper time, the superfluous liquid is poured away and—after an interval for drying—the moulds are opened up and the various pieces are carefully removed and trimmed. They are then fitted together into a complete model, a process demanding great precision and delicacy of touch.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Flower-making is a specialized branch of work which invariably fascinates visitors to our Burslem unit. Each flower is made separately by hand. A roll of clay is thinly spread on the hand and from that the petals, stalks and other parts of the flower are deftly shaped and built up into the form of a flower.

After having been assembled and finished in the clay state, the figure is slowly dried to remove surplus water before the first major firing. It is then placed with others in a fireclay container which in turn is placed in a pottery oven, in which it is fired or "baked" at a temperature far beyond the melting point of most metals. This firing changes the clay into a pure white body known as "biscuit china." The firing temperature at various stages has to be most accurately controlled—if the heat were one or two degrees too intense the figures would be distorted or destroyed; yet it is only by approaching the danger-point that the translucent beauty of the figure can be achieved.

Each figure before going into the oven must be secured by a number of props to prevent projecting parts from falling out of shape. During firing each figure shrinks considerably in size and this factor has, of course, to be taken into account when forming the master moulds.

After this first firing the figure has a matt surface. It is dipped into a specially prepared glaze and then receives its second hard firing in what is known as a "glost" oven. The glaze coating fuses during this process and becomes virtually a thin coating of glass, giving a beautiful but not excessive sheen to the ware.

From this stage onwards, the artists decorate the white translucent figure. Without exception, every Royal Doulton figure is coloured by hand. The colours are not ordinary paint; they are special ceramic colours evolved, for the most part, from metal bases. \* \* \*

The creation of a new figure model may take as long as four months—that is, from the time the original working model is approved to the final firing of the complete figure.

Mr. Noke stated further that the painting of the figures is done by artists who have been trained in this branch of work; that only artists who have had art school training or who have been trained in the Doulton training school are employed; that the painting of a particular figure is carried out entirely by the artist to whom

it is assigned, except that the painting of facial details may be done by specialists; that each artist is responsible for the perfect completion of the figure from start to finish; that before each fire, the figure is examined by experts for any signs of imperfection; that the originators of the original models of the exhibits before the court are: Charles J. Noke, Fred T. Daws, and Leslie Harradine; that they work from instructions given by the witness and follow his ideas before submitting the models for inspection; that Charles J. Noke, father of the witness, commenced work as a modeler at Worcester in 1874 and joined Doulton in 1890; that his modeling for the Chicago Exhibition in 1893 received high awards, and he received many medals at International Exhibitions, including Brussels, Turin, and Paris; that he modeled portraits of well-known people, including Sir Edward Elgar and Mr. Rupert Kettle, K. C.

The witness stated further that the modeling and painting of figures is always done by individuals who have had special art training and that the making of the molds is undertaken by men who are specially trained for that work: that with the exception of the mechanical process of firing, none of the work in producing the figures is done by artisans or mechanical means; that the figures have no utilitarian purposes, that each figure, although of the same design and character, is individually made; that they are produced from a mold, made from the original model, but every process after the figures leaves the mold is done by hand.

Leslie Harradine stated in his deposition that he is a sculptor and has been engaged for the last 35 years in the production of portrait busts, figures, and reliefs; that he studied at the Camberwell School of Art, London, under Albert Toft, a well-known British sculptor; that he has not sent his work to exhibitions but has sold his work privately; that he did exhibit some of his work at the International Exhibition of Modern Art in Paris in 1925 and was awarded a silver medal; that he has modeled and designed statuettes for Doulton for more than 30 years; that he modeled the following figures for Doulton which are involved herein:

| | |
|---|---|
| Little Bridesmaid | No. 1433 |
| Rose | 1368 |
| Sweet and Twenty | 1298 |
| Autumn Breezes | 1913 |
| Chloe | 1765 |
| Dorcas | 1558 |
| Lydia | 1908 |
| Miss Demure | 1402 |
| Paisley Shawl | 1392 |

Mr. Harradine stated that in producing the models he follows suggestions made by Doulton; that Doulton may suggest a character, send a sketch, or an illustration to indicate an idea; that he follows "any ideas as to a suitable representation of the ideas suggested and visualize an idea, seeing it clearly I proceed to create it in clay, modeling from life or imagination"; that the clay model is sent to Doulton with any ideas for coloring and special points to be followed when producing the finished figures. He stated that he never worked for Doulton as an employee but did his work at his own studio; that he has executed commissions for private individuals in various media; that he considers the figures involved herein to be works of art since each is the conception and creation of an artist; that every detail from the modeling in clay to the finished model including the decorative ideas are his work as a professional sculptor and artist.

In answer to cross-interrogatories, Mr. Harradine stated that he designs and models the original clay model for each subject for Doulton; that there is one original of each subject; that he has nothing to do with the process of molding and casting; that he did not know how many molds were made from his originals

or how many castings were made from each mold; that he did not paint the decorative effect or design on the figures; that he does not personally supervise the painting of the replicas and does not know the persons who do the painting.

Frederick Thomas Daws stated in his deposition that he is an artist and sculptor specializing in the painting and modeling of dogs and other animals; that he studied at the Lambeth School of Art in London and is a life-long student of animal life at the Zoological Society of London; that he has exhibited pictures and models at the Royal Academy of Arts of London, the Salon in Paris, the Walker Art Gallery, Liverpool, the Bristol Academy, and the Royal Society of British Artists, London; that he has produced models of dogs and other animals for Doulton since 1930 or 1931, many from life, some from ideas of his own, and some from suggestions by Doulton; that he modeled the following figures involved herein:

| | |
|---|---|
| English Setter and Pheasant | No. 2529 |
| English Setter | No. 1051 |
| Rough Haired Terrier | No. 1014 |
| Cocker and Pheasant | No. 1029 |
| Cocker Spaniel | No. 1078 |
| Cocker Spaniel | No. 1036 |
| Cocker Spaniel | No. 1037 |
| Irish Setter | No. 1056 |

The witness stated that each of the above was modeled in clay or wax and then cast in plaster; that two of the plaster models were delivered to Doulton, one in full color as it was to appear when produced in china, to serve as a guide for the artist employed by Doulton when working on the china model, the second copy remaining unpainted from which to make molds for production in pottery. The witness stated that he has never worked as an employee of Doulton but has his own studio; that he has done work for rendering in pottery for no other firm; that the figures are works of art since they are the inception of a professional sculptor and every detail from the modeling to the finished original is his work as a professional artist.

In answer to cross-interrogatories, Mr. Daws stated that in each case he made one original model only in clay or wax; that he personally created the decorative effect or design for each figure; that he personally painted each original; that he had nothing to do with the preparation of the molds; that he had nothing to do with the casting of the original figures except "to the extent of removing seams from the cast made from sections of moulding and finally touching up generally"; that he did not know how many molds were made from each original nor how many castings were made from the original mold; that he did not paint the decorative effect on each copy, reproduction, or replica of the figures, and he did not know the individuals who did; that he did not supervise the painting of the copies, reproductions, or replicas of the figures.

A set of questions was propounded to each of the individuals who painted the figures and their answers were substantially as follows. That they were artists or figure artists employed by Doulton from 2½ to 22 years; that they were trained at schools of art in the correct mixing and application of ceramic colors and the effects that firing has on them; that they had no other occupation than painting figures for Doulton; that the men painted the complete figure and the women painted all of the figure except the face; that they had nothing to do with the casting of the figures and did not know how many castings were made; that they received the figures from the foreman of their respective shops; that they received instructions from them as to coloring the figure to match the pattern given as a guide; that the figure as delivered to them did not embody their professional or

personal skill; that the artistic conception did not originate with them; that they did not know who created the figures; that they knew who created the color scheme for the figure; that the person who created the original [apparently meaning the original color scheme] supervised their work; that he gave them instructions as to what colors to be applied and where to apply them to get the effect required; that they had had training in painting in art school; that all but two were employed by Doulton or other pottery firms while attending school; that with the exception of four, none had had any public exhibitions or showings of paintings, and of said four, one had exhibited one painting, and the others had exhibited several; that only three had sold any paintings; that it took them from 1 to 5 hours to paint one figure; that they painted from two to eight figures per day.

Plaintiff called three witnesses at the trial: Wheeler Williams and Nathaniel Choate, sculptors, and John N. Graham, curator in the Brooklyn Museum of Decorative Arts.

Mr. Williams summarized his education and qualifications as a sculptor, stating that he had done a great deal of work with ceramic sculpture. He testified that the requisite for bringing ceramic sculpture within the domain of the fine arts is the intent of the artist. He then described the method of making porcelain sculptures and stated that it was impossible for the artist to perform each step of the process but that the finished articles are works of art created by the artist; that when he himself created ceramic sculptures, he checked the work of the molders and casters from time to time; that he threw away many figures because they were warped in the firing; that eight of each figure were made before a satisfactory one was produced. He stated that, assuming exhibits 1 to 18 were produced by substantially the same process he described, they were works of fine art; that "you can't eat them or use them or do anything but derive satisfaction or pleasure from them".

On cross-examination the witness stated that the exhibits were works of art because they conveyed beauty in the sense the artist meant them to; that a work of art should be a sincere attempt to express in three-dimensional rhythmic forms an emotion or an aspect of life; that the artist hopes to share and communicate his ideas, reactions, and feelings with others.

Plaintiff's second witness, Nathaniel Choate, outlined his training and experience as a sculptor and painter and stated that he had produced ceramic sculptures; that all sculptures come within the domain of the fine arts; that in his opinion the exhibits herein are works of art because they are decorative and are designed for their beauty and their aesthetic appeal.

Mr. Graham stated that he had always been especially interested in ceramics; that he has built up a large collection of American ceramics at the Museum; that they have had sculpture of the ceramic arts that he considers works of the fine arts; that such a piece would be the creation of an artist's imagination without relation to use; that the exhibits herein are works of art; that—

I see no difference between those figures and figures that have been produced in the past which you accept in every great collection and which are shown in all museums throughout the world; that I also don't see any difference in the method of production and the conception of the figures of things that we recently have shown from other contemporary people.

Defendant called Alex J. Ettl, a sculptor for 36 years, whose qualifications were conceded by plaintiff's counsel. He stated that his experience in ceramic arts has been in making molds; that the firm of which he is a partner has made molds for other sculptors; that he has made models which have been molded and resulted in ceramic works of fine arts.

The witness was shown plaintiff's exhibit 1 and was asked a hypothetical question predicated upon the record, and in response thereto he stated that the figure was not a work of art. He was asked a similar question and gave the same answer in regard to plaintiff's exhibits 2, 3, 4, 6, 7, 10, 11, 12, 13, 14, 15, 16, 17, and 18. He testified that they were not works of art because, in his opinion, the originals were not works of art; that it was not conceivable that the actual production of the piece and the finishing of it in all its detail could be done by several outside workers and still remain the original creation of the sculptor who created the original; that the sculptors who created the originals were not producing works that would satisfy their feelings, emotions, and opinions, but were designing sculpture to satisfy a mass buying market; that the sculptor in no way participated or inspected or finished the figures; that he allowed other hands to remove the mold seams, correct the distortions that take place in the shrinkage, and in no way put into it the personal qualities that works of art must have; that in the production of a piece of fine art, the sculptor makes a limited edition of from 10 to 20 or possibly 200 pieces; that he works over each piece that comes out of the mold. He stated also that works of art are not made in large quantities in factories or commercial establishments.

Felix Wildenstein, called as a witness by the defendant, testified that he has been a dealer in paintings and works of art for 48 years and that his firm handles high-class paintings, tapestries, and occasionally sculpture; that they have handled della Robbia majolica; that in his opinion the exhibits herein are not works of art; that he did not consider as a work of art anything that has not been conceived by the originator; that no great sculptor would allow anything to be done without his supervision

William Zorach, called as a witness by the defendant, testified that he has been a sculptor and painter for 40 years, and his qualifications were conceded by plaintiff's counsel. He was shown the exhibits herein and was asked hypothetical questions predicated upon the record. He stated that plaintiff's exhibits 1, 2, 3, 4, 6, 7, 10, 11, 12, 13, 14, 15, 16, 17, and 18 were not works of art because they were made in large quantities and glazed and fired by artisans; that they could have been works of art only if the sculptor had modeled each individual piece, cast it, fired it, and glazed it with his own hands so that each piece would have variations; that an object is not a work of art unless it has art content; that when an artist works with the thought of selling a thing commercially, that thing loses any quality of art content in large production.

He stated also that works of art are not made in large quantities in factories or commercial establishments; that works of art are made only in limited editions to the number of 10 or 12, and the making is supervised by the artist himself; that where suggestions for figures are made by Doulton, the objects are not works of art; that if the artist is great enough, he can produce a work of art from a suggested subject, but that in the highest form, a work of art is the creation of the artist himself without any outside suggestion; that a work of art is done by the artist himself from beginning to end; that where a sulptor prepares a model for reproduction in porcelain for commercial purposes, the original model is a work of art, but the reproductions are not.

Defendant called Edwin Pearson, who testified that he has been a sculptor since 1923 and is still actively engaged in the profession. He was shown the exhibits and asked hypothetical questions predicated upon the record. He stated that the exhibits were not works of art because they were made for commercial purposes; that a work of art can exist once; that a reproduction is not a work of art; that a work of art is an activity; physical, spiritual, and mental activity from the time the sculptor starts to the time when the impulses cease; that beyond

that any reproductions or copies may carry the message but they cannot be original works of art; that the original models herein were not works of art because the artist is the Doulton Co.; that the sculptor and the artisans are a part of an assembly line.

William W. Hunter, china and glass buyer of Plummer, Ltd., called as a witness by the defendant, testified that Plummer, Ltd., carried Doulton figures, such as plaintiff's exhibits 1 to 18; that he is in charge of the buying and selling of such figures; that he did not recall that any of the literature received from Doulton ever referred to the figures as work of art; that he never calls them works of art; that they kept at least six of each figure in stock.

In the beginning of this opinion we stated that counsel for the respective parties do not agree with respect to the scope of the issue which we are called upon to determine. It is proper to give attention to that matter at this point.

From the facts recited it appears that a sculptor makes a clay or wax model of the particular figurine which it is desired to produce and from it a mold is fashioned. Because of the form of the model, the mold must be in segregated parts, and in each separate part the appropriate portion of what ultimately is to be the figurine is cast or molded. The separate portions are then removed from the mold, joined together, properly trimmed, given a finishing surface treatment, and finally painted or decorated by hand.

We do not understand it to be questioned by counsel for the Government that the witnesses Harradine and Daws were professional sculptors having their own studios at which they work. It is contended, however, that the particular original articles here involved which they modeled are not sculptures within the meaning of paragraph 1547 (a).

The sculptor Harradine stated that he had nothing to do with the process of molding and casting, but that when he sent a model to Doulton & Co., Ltd., to be used in the making of molds, he accompanied it with suggestions as to colorings, not, however, himself painting the model.

With the sculptor Daws, who made the dog models, which are of china, or porcelain, the situation appears to be somewhat different in that, while he had nothing to do with the preparation of the molds, they being made by a molder whom he employed, nor with the casting of the original figurines, he did remove the seams from the casts made from the sections of the moldings, finally "touched the figurines up generally," and also he delivered to Doulton one extra model in full color as it was to appear when produced in china. He did the painting on the extra model, which he refers to as the master model, himself, but did not paint any copies, reproductions, or replicas of the original.

Another fact important to be borne in mind is that the molds deteriorate with use and in order to maintain the exact similarity of

the figurines, when it is desired to have a large number of reproductions, new molds must be fashioned. This is done by utilizing the original model made by the sculptor. So far as we have found, there is no evidence as to how often new molds are required. Of course, the producers may make several molds at approximately the same time and have them ready for use when needed.

In the light of the facts so stated, the trial court, after reviewing a number of decisions to some of which we hereinafter refer, said:

\* \* \* an object may be a work of art even though the sculptor does not do all the work of molding and casting. In the instant case, moreover, the sculptor, Frederick Daws, stated that he removed the seams from the molds and touched them up generally, and he painted one of the plaster models in the colors he desired, to serve as a guide for the artist who painted the porcelain article. He appears to have done all that a sculptor ordinarily does in producing ceramic sculptures. As stated by the witness, Williams, the work of molding, casting, and painting on porcelain has to be done by experts specially trained for that work. The sculptor, Leslie Harradine, stated that when he sent the clay models to Doulton, he also gave them instructions to be followed in producing and coloring the figure.

*We conclude, therefore, that the original reproductions in porcelain of the clay models made by the sculptors were works of art.* (Italics supplied by us.)

It was held, however, that the copies were not classifiable as works of art, because such copies were not regarded as the work of the sculptor who made the original model, or by any sculptor.

We must state frankly that we are not sure that we understand correctly the holding which we have italicized. It would seem that by the use of the phrase "in porcelain" it must have been intended to limit the operation of the holding to those articles which were classified under paragraph 212, *supra*, that is, the dog figures, or dog figurines, but it seems uncertain whether it was intended to hold that *just one* (the first) article to come from the *first mold* would be classifiable as a work of art or that *all* those which might be made from the *first mold* would, as reproductions, be so classifiable. The holding also is capable of the interpretation that the first figurine of each mold would be classifiable as a work of art, or sculpture.

Whatever may be the correct interpretation of the holding, the brief on behalf of appellant argues, in effect, that the *broad* issue of whether the merchandise was classified properly under paragraphs 211 and 212, respectively, which was before the trial court, is not before us and that all we are called upon to determine is whether there "should be a distinction made between the figures produced from the first mould [1] and those produced from another identical mould made from the sculptor's same original clay or plaster model."

As has been intimated, the trial court's holding that the original

---

[1] The word properly may be spelled either "mold" or "mould." We have used the first form in our own writing but when the second is used in matter that we quote the form there appearing is followed.

figurine is a work of art within the meaning of paragraph 1547 (a) seems to be limited to porcelain articles. So, the contention would not seem to apply to those earthen articles which were classified by the collector under paragraph 211, *supra*, in any event, but aside from this we do not think the contention tenable even as to the porcelain articles.

Counsel for appellant argues, in substance, that, since the Government did not cross-appeal from that portion of the court's decision, it may not be heard to question before us as an appellate tribunal the correctness of that view. This overlooks the fact that, as the brief of counsel for the Government points out, the appeal to us is from the judgment rendered by the trial court; not from the opinion stating reasons. A judgment may be right, even though the reasons given for it are wrong.

There was no judgment against the Government in this case, and it had no reason for appealing.

We think it is incumbent upon us to consider the dutiable status of the originals of the molded figurines as well as that of the copies, replicas, or reproductions.

In the Tariff Act of 1930 there are five paragraphs which begin with the phrase "Works of art." The first is 1547 (a), a portion of which is here involved. It appears in the sundries schedule, and reads in full as follows:

Par. 1547. (a) Works of art, including (1) paintings in oil or water colors, pastels, pen and ink drawings, and copies, replicas, or reproductions of any of the same, (2) statuary, sculptures, or copies, replicas, or reproductions thereof, valued at not less than $2.50, and (3) etchings and engravings, all the foregoing, not specially provided for, 20 per centum ad valorem.

The forerunner of paragraph 1547 (a) appeared for the first time in the 1913 tariff act as paragraph 376 thereof. A duty of 15 per centum ad valorem was provided for all articles classifiable under it. It was repeated as paragraph 1449 of the Tariff Act of 1922, the only difference being that in the 1922 Act the rate of duty was fixed at 20 per centum ad valorem, the same rate as that in the subsequent 1930 Act.

However, it should be noted that in the 1930 Act Congress inserted "valued at not less than $2.50," a limitation which had not been present in the respective acts of 1913 and 1922. That new matter and the higher rate constitute the only changes from the 1913 tariff law. It seems not inappropriate to suggest at this point that the Congress which passed the 1930 Act evidently felt that there are, at least for tariff purposes, works of art, including statuary and sculptures, which are of low value so far as dollars and cents are concerned. This appears to be true despite the vigorous, and at times somewhat indignant, testimony of some of the Government's witnesses—the witness Zorach in particular—given in this case.

The other four paragraphs containing the introductory phrase "Works of art" appear in the free list schedule of the 1930 Act as paragraphs 1808, 1809, 1810, and 1811, respectively. No one of these has any relevancy to the issues of the instant case.

There is, however, a paragraph of the 1930 Act, which does not have anywhere in it the phrase "Works of art"—paragraph 1807 in the free list schedule—a portion of which has influenced, within limits, the construction which has been placed upon paragraph 1547 of the 1930 Act and its predecessor paragraphs—1449 of the 1922 Act and 376 of the 1913 act.

We here quote that paragraph and we direct particular attention to the several phrases reading "as used in this paragraph," the word "this" therein being italicized by us for reasons hereinafter appearing.

Par. 1807. Original paintings in oil, mineral, water, or other colors, pastels, original drawings and sketches in pen, ink, pencil, or water colors, artists' proof etchings unbound, and engravings and woodcuts unbound, original sculptures or statuary, including not more than two replicas or reproductions of the same; but the terms "sculpture" and "statuary" as used in *this* paragraph shall be understood to include professional productions of sculptors only, whether in round or in relief, in bronze, marble, stone, terra cotta, ivory, wood, or metal, or whether cut, carved, or otherwise wrought by hand from the solid block or mass of marble, stone, or alabaster, or from metal, or cast in bronze or other metal or substance, or from wax or plaster, made as the professional productions of sculptors only; and the words "painting," "drawing," "sketch," "sculpture," and "statuary" as used in *this* paragraph shall not be understood to include any articles of utility or for industrial use, nor such as are made wholly or in part by stenciling or any other mechanical process; and the words "etchings," "engravings," and "woodcuts" as used in *this* paragraph shall be understood to include only such as are printed by hand from plates or blocks etched or engraved with hand tools and not such as are printed from plates or blocks etched or engraved by photochemical or other mechanical processes.

We have not found it necessary fully to trace the genesis of paragraph 1807. The only decision by the Supreme Court of the United States which seems to have any particular pertinency relative to the issues here involved was rendered in the case of *Merritt* v. *Tiffany*, 132 U. S. 167. According to the decision, the merchandise there involved consisted of "various bronze statues and statuettes," which the importer claimed a right to enter as statuary on paying a duty of 10 per centum ad valorem, but which was assessed with a duty of 45 per centum ad valorem as non-enumerated manufacture of copper. It further appears that the tariff act in force at the time of the importations in 1880 and 1881 contained a paragraph reading:

Paintings and statuary, not otherwise provided for: ten per centum ad valorem. But the term "statuary," *as used in the laws now in force* imposing duties on foreign importations, shall be understood to include professional productions of a statuary [2] or of a sculptor only. (Italics supplied by us.)

[2] Evidently "statuary" as used at this particular point is synonymous with "sculptor." It has such a dictionary definition but, so far as we have observed, it is not employed customarily at this period of time for expressing that meaning.

In that case the Supreme Court said, *inter alia:*

* * * What productions are to be deemed professional productions of a statuary or a sculptor it is difficult to state in general terms, so as to embrace every article of the kind. It is sufficiently accurate, however, for this case, to say that the definition embraces such works of art as are the result of the artist's own creation, or are copies of them, made under his direction and supervision, or copies of works of other artists, made under the like direction and supervision, as distinguished from the productions of the manufacturer or mechanic. The definition does not limit the professional productions to those of the sculptor's creation. As said in *Tutton* v. *Viti,* 108 U. S. 312, 313: "An artist's copies of antique master-pieces are works of art of as high a grade as those executed by the same hand from original models of modern sculptors."

The judgment of the court which tried the case, in favor of the importer, was reversed and the cause was remanded for a new trial because the Supreme Court held that the trial court erred in refusing to instruct the jury that:

If they find from the evidence that the imported articles were made, not by professional sculptors or statuaries, or by their assistants under their direction, but were made by skilled workmen or mechanics in the employ of the manufacturer, then their verdict should be for the defendant.

In the discussion in POINT III of the brief on behalf of the Government under the heading, "The imported articles are not 'works of art' within paragraph 1547 (a)," there is quoted from paragraph 1807 the clause reading " * * * but the terms 'sculpture' and 'statuary' as used in this paragraph shall be understood to include professional productions of sculptors only, * * *" and it is then argued that "It would be expected that if the words 'statuary' and 'sculptures' were used *elsewhere* in the tariff act their meaning would be controlled by the above definition." (Italics supplied by us.)

Assuming the quoted clause to be a "definition," we do not agree that normally such a result would be expected.

Prior to the 1913 tariff act the *scope* of the clause extended to the entire tariff acts in which it appeared. In the *Merritt* v. *Tiffany* case, *supra,* the phraseology is " 'statuary,' *as used in the laws now in force* [italics supplied by us] imposing duties on foreign importation, * * *" thus covering all existing laws. Paragraph 470 of the 1909 act had a provision for both sculptures and paintings "as used in this Act," thus covering the whole act, but paragraph 652 of the 1913 act substituted "as used in this *paragraph,*" (italics supplied by us) and that limitation was preserved in paragraph 1704 of the 1922 Act and in paragraph 1807 of the 1930 Act, the latter of which is quoted, *supra.*

That the change, potentially at least, wrought a change in statutory law seems clear and Congress is not accustomed to change the laws idly and without purpose.

However, it seems to be the view of counsel for the Government that the expectation of the matter referred to by counsel for the Government has been settled by judicial decision. The brief states:

* * * The point has been settled by judicial pronouncement. Qualifications for admission within the dutiable provision for "sculpture" and "statuary" in paragraph 1547 and its predecessor are the same insofar as it relates to the degree of artistic merit required. *Stern* v. *United States*, 3 Ct. Cust. Appls. 124, T. D. 32381, [22 Treas. Dec. 564]; *Consmiller* v. *United States*, 3 Ct. Cust. Appls. 298, T. D. 32585, [22 Treas. Dec. 983]; *United States* v. *Downing & Co.*, 6 Ct. Cust. Appls. 545, T. D. 36197, [30 Treas. Dec. 319]; *Friedlaender [Co.]* v. *United States*, 19 C. C. P. A. (Customs) 198, T. D. 45295, [60 Treas. Dec. 960].

The first case immediately above cited (the Stern case) arose under the 1909 tariff act and seemingly was decided about eighteen months before the 1913 tariff act became effective. The second (the Consmiller case) also arose under the 1909 act and seemingly was decided about sixteen months before enactment of the 1913 act. As has been stated, the forerunner of paragraph 1547 (a), *supra*, originated as paragraph 376 of the 1913 act and the limitation of the definition of "sculpture" to paragraph 1807, *supra*, also originated in the 1913 act. The scope of the definition in the 1909 act was co-extensive with the entire act.

The first case which arose under the 1913 act that seems to be directly relevant here was the third case cited, *supra*, in the brief for the Government—that of *United States* v. *Downing & Co.*, *supra*.

The decision in that case was written by the late Judge Orion M. Barber, one of the first of the judges appointed to this court. It is a comprehensive opinion which has been followed consistently by this court.

The following is a portion of the description of the merchandise given in the decision:

Considered as an entirety the importation is a round temple, the dimensions of which are not shown. It is represented by photographic exhibits and is probably intended to be set up in a yard or garden. It does not appear to be designed to serve any special utilitarian purpose and is claimed to be devoted to and designed for artistic purposes. By Exhibit 5 the general appearance and circular form is shown. The main structure seems to be composed of marble or stone resting upon a foundation and surmounted by a dome. The board assumed, and we judge correctly, that the stone ring which was mentioned in the invoice and which consists of several pieces was in whole or in part of this foundation; that the dome was a grille work of iron; and that the marble table, if designed in connection with the temple, was appropriate to be placed inside. With the foundation stones, the dome, and the table we are not concerned, except so far as they are involved in the question of entirety, hereinafter referred to.

The reason this court was not concerned with the stones, the dome, and the table, except in the particular mentioned, was that the importer had abandoned the protest insofar as it applied to those particular parts at the trial before the Board of General Appraisers (now the United States Customs Court).

Other descriptive details of the merchandise recited in the opinion need not be repeated here.

The merchandise had been classified by the collector under paragraph 98 of the 1913 tariff act which provided for "marble * * * wholly or partly manufactured into monuments, benches, vases and other articles," duty being assessed at 45 per centum ad valorem. The protest claimed free entry under either paragraph 652 or paragraph 656 of the act, and also made a claim for classification under paragraph 376; *supra*, with duty assessment at 15 per centum ad valorem. The last claim had been sustained by the trial tribunal and the appeal by the Government brought before this court the single issue of whether the merchandise was dutiable as assessed or as held below.

In the course of its decision this court said, *inter alia:*

The board's [now the United States Customs Court's] judgment, * * *, if we correctly understand the opinion, was this: The importation under consideration was not shown to possess the antiquity required under paragraph 656, nor to be an original sculpture, the production of a professional sculptor only, or one of not more than two replicas or reproductions thereof under paragraph 652, but was, nevertheless, a work of art under paragraph 376 because it was a sculpture thereunder.

This conclusion at once suggests the query as to what is the difference, if any, between the meaning of the term "sculptures" in paragraphs 652 and 376. It should be observed that paragraph 376 includes sculptures in the term "works of art," and provides that sculptures shall embrace copies, replicas, or reproductions thereof if none of the same are otherwise provided for in the section. Paragraph 652, on the other hand, limits the "sculptures" therein provided for to originals, which are the professional productions of sculptors only, whether cut, carved, or otherwise wrought by hand from certain materials, and made as the professional productions of such sculptors, including not more than two replicas or reproductions of the same, with the proviso that articles of utility as well as those made wholly or in part by stenciling or other mechanical process are not to be included therein, but it does not undertake to give any meaning to the word other than for the *purposes of that paragraph.* (Italics supplied by us.)

This court then stated that the provisions of paragraph 470 of the 1909 tariff act had been embodied in paragraph 652 of the 1913 act which latter paragraph (652) was quite similar to paragraph 1807 of the Tariff Act of 1930, *supra*, and said:

We think comparison of the two shows that in a general way it was the purpose of Congress by the enactment of paragraph 652 to give free entry to articles that had previously been dutiable under paragraph 470. One of the chief differences between the two is that such privilege is confined to two replicas or reproductions of sculptures and that articles of utility or such as are made wholly or in part by stenciling or other mechanical processes (the methods of the artisan) are excluded therefrom.

We also note that paragraph 470 enumerates certain things that shall be considered "sculptures" for the *purposes of the act*, while paragraph 652 confines its enumeration in that behalf *to the purposes of the paragraph.* (Italics supplied by us.)

It was then said of paragraph 376:

On the other hand, paragraph 376, *which is new law, does not expressly define* "*sculptures,*" and *does not limit the number of copies, replicas, or reproductions*

*thereof* that are entitled to the same benefit (evidently meaning the same rate of duty as the original). It follows, therefore, that the word must be given the meaning ascribed to it *in common understanding* unless elsewhere limited. No such limitation is called to our attention. * * * (Italics supplied by us.)

The foregoing was followed by the citation of numerous decisions of this court, some of which were analyzed, that led the court to say relative to the common meaning of "sculpture":

The fact that paragraph 470 [of the 1909 act] limited sculptures to the professional productions of sculptors only, *a limitation not found in paragraph 376,* as already noted, does not, as we view the matter lower the standard or quality of work required to constitute a sculpture within the meaning of the latter paragraph. In the common acceptation of the term, a work to be entitled to the characterization of sculpture must be the production of a professional sculptor. It must be a work that embodies professional skill, taste, touch, and artistic conception, appealing not only to the eye but the emotions as well, and although "sculptures" may include under the statute copies of recognized works of that art, yet such copies must possess the same qualities or characteristics, and, whether an original or a copy, must be made either by or under the supervision of a professional sculptor. It is unbelievable that a sculpture in the common understanding can be produced by one who has neither embraced that profession nor has artistic skill, taste, touch, or ability in exercising it. (Italics supplied by us.)

This court also there referred to the decision of the Supreme Court of the United States in the case of *Tutton* v. *Viti*, 108 U. S. 312, decided April 23, 1883. (It arose under the same statute as that applicable in the case of *Merritt* v. *Tiffany, supra.*) There was involved in that case the classification of certain statuettes which had been carved from marble by professional sculptors following original models whose authors were unknown. The Supreme Court said, *inter alia:*

There is nothing in the acts of Congress to limit the professional productions of a statuary or sculptor to those executed by a sculptor with his own chisel from models of his own creation and to exclude those made by him, or by his assistants under his direction, from models or from completed statues of another sculptor, or from works of art, the original author of which is unknown. An artist's copies of antique masterpieces are works of art of as high a grade as those executed by the same hand from original models of modern sculptors.

The copies of the sculptures there involved, of course, belonged in the class of what are known now as the free fine arts. No paragraph similar to paragraph 1547 (a), *supra,* was in existence then.

This court also cited there the decision of the Supreme Court in the case of *Merritt* v. *Tiffany, supra,* and commented:

* * * The effect of both these cases [*Tutton* v. *Viti, supra,* and *Merritt* v. *Tiffany, supra*] is that sculpture or statuary may include copies or reproductions by sculptors of works of art, the original design of which was their own or that of some other artist.

It should be noted that this court found in the *Downing & Co.* case, *supra,* that, because the importer had not appealed from the trial

tribunal's decision that the temple was not entitled to free entry, there was no claim before it, i. e., this court, that the structure was *"an original sculpture or the professional production of a sculptor only."* (Italics supplied by us.) So, except as the court considered the definition with reference to its possible effect on paragraph 376, *supra,* there was no occasion to consider it at all.

The decision of the trial tribunal holding applicable paragraph 376 of the 1913 act (forerunner of paragraph 1547 (a) here involved in part) was reversed and therefore the classification of the collector under paragraph 98 of the 1913 act stood without any necessity of analysis, it being at least presumptively correct.

The *Friedlaender Co.* case, *supra,* also cited in the brief for the Government, arose under the Tariff Act of 1922 in which paragraph 1449 was the same as paragraph 1547 (a), *supra,* of the 1930 Act, except as to the $2.50 valuation provided in the latter for copies, replicas, or reproductions.

The merchandise there involved is described in the decision, written by the late Presiding Judge Wm. J. Graham, as follows:

The physical exhibits produced before the court are of various types. They consist in the main of statuettes of human beings, animals, and birds, in various postures. In a few cases the material of which these objects are made is bronze. Most of them are made of spelter. Many have bases of marble or onyx or composition stone, and a few of the articles are composed in part of ivory or ivoryoid. In one class of these articles no utilitarian purpose seems to be served, and they are purely decorative. In another class a distinctly utilitarian purpose is accomplished, some of them being book ends, others desk sets having ink bottles, pen trays, and the like, and a third class is obviously lamps for use in electric lighting. A considerable number of this last class are particularly adapted for use as newelpost fixtures. One exhibit represents a figure of a nude woman gazing into a pool of water, which pool is intended to be illuminated by a small electric bulb beneath a transparent or translucent layer of glass or stone. Another represents a number of wading birds standing about the edges of a similar illuminated pool made of translucent stone. Another represents a group consisting of an Arab mounted on a camel with a female figure carrying water, and these figures surmounted by a palm tree under the leaves of which are two small electric-light bulbs, the whole piece containing hidden wiring for use in connection with electric-light current. When the lights are lit a pleasing glow is reflected upon the figures beneath.

These articles are bought, sold, and used for decorative purposes and are generally pleasing in appearance.

The method of making the different articles also is described in our opinion. It was not substantially different from the method employed in making the figurines here involved, but an extremely important phase of that case was that it was not satisfactorily established that the *original models were made by professional sculptors*.

Only one witness—apparently the importer—testified on this point. He stated that originally a clay model was made "by some sculptor or artist," but in our decision it is said:

The witness was unable to state the name of any sculptor or artist who had prepared any of the original models for these articles. He stated, in a general way, that they were made by artists, giving as his reason therefor that no one but an artist or sculptor could prepare such models. The witness was not an artist or sculptor, and the testimony he gave was not that of an expert in art but of one who dealt in these articles as a commercial proposition.

Inasmuch as it was necessary to establish that the original models used in the making of the molds in which the figurines were cast was the work of professional sculptors, before the tariff status of the copies, replicas, or reproductions with reference to paragraph 1547 (a), *supra*, was entitled to consideration, the importer's failure in that case was fatal to his cause, and much of what was said thereafter in the opinion was unnecessary and hence may be regarded not improperly as obiter. Many of the articles were eliminated, of course, because of their utilitarian character.

In any event, a careful study of the instant case in the light of its very complete record and in the light of the comprehensive briefs of counsel for the respective parties leads us to a different conclusion from that reached in the *Friedlaender Co.* case, *supra*.

Our conclusions, with the reasons therefor, will be stated in narrowest compass deemed consistent with clarity.

We first wish to be understood as being of opinion that (1) Congress clearly intended that the sculpture and statuary embraced in paragraph 1807 of the Tariff Act of 1930, *supra*, should be only those articles which are the work of professional sculptors; and (2) that the same applies to the two replicas or reproductions for which free entry is provided. The reason for this is obvious. Unlimited copying of objects of fine art and commercialization of them might readily destroy their value as art.

Further, we agree that the phrase "works of art," used in paragraph 1547 (a), *supra*, contemplates that the *original* statuary or sculptures provided for in the paragraph shall be the work of professionals. We do not entertain this view, however, because of the phraseology in paragraph 1807, *supra*. As we now view the matter, there is no reason for considering the two paragraphs *in pari materia*. While paragraph 1807 relates to art objects of the highest and finest type, it has no "works of art" phrase and such definition of sculpture as it contains is limited to the paragraph itself by express terms. In the *Downing & Co.* case, *supra*, the court very properly went to common understanding to determine what was meant by "sculptors" and "sculpture" as used in paragraph 376 of the 1913 act, and we follow it in that regard with respect to paragraph 1547 (a), *supra*.

It does not follow, however, that our agreement that the original model of an object such as a figurine must be the work of a professional sculptor in order to conform to the legislative intent respecting what

shall be regarded as a work of art within the meaning of paragraph 1547 (a), *supra*, means that we think the copies, replicas, or reproductions of first figures, or figurines, coming from the molds also must receive the inspection, supervision, and care of a professional sculptor in order to obtain classification under that paragraph. We do not now so believe and in that respect we differ with the conclusion of the trial court.

When the nature of the subject matter of the figurines and the method of their production are considered; it seems to us that no sound reasoning has been or can be adduced to support such a conclusion. If supported at all, it is supported by mistaken precedents only, and it has been asserted frequently that a mistake of yesterday should not be perpetuated and thus continue to be the law of today and tomorrow.

As we have indicated, Congress, in paragraph 1807 sought to protect the aesthetic taste of peoples against commercialization of that fine art which is the product of a somewhat rare and a very special genius.

There was no such motive with respect to figurines of the kind before us. Although many of them have a genuine beauty and none of them was created for utility, they were intended to be and are articles of common commerce.

The very fact that the Congress which passed the Tariff Act of 1930 saw fit to add to the prior law the provision "valued at not less than $2.50" as applied to "copies, replicas or reproductions" seems to us to be convincing that there was no intention that the services of a professional sculptor should be obtained for work on an article of that low value. Besides, what would a sculptor do with respect to such articles as figurines? Already he has done all that a professional sculptor is supposed to do when he completes the model upon which the molds are formed. He is not in the same situation as the sculptor who essays to reproduce objects of the fine arts falling within the classification of paragraph 1807, *supra*.

In the decision of the court in the case of *United States* v. *Downing & Co.*, *supra*, it was said, in substance, that the n. s. p. f. provision in paragraph 376 of the 1913 tariff act coupled with the absence of the word "original" before "sculptures" left a wide scope for the operation of the paragraph. For example, the decision stated:

\* \* \* An article which would be a sculpture under paragraph 652 [which is similar in certain respects to paragraph 1807 of the 1930 Act] would be likewise such under paragraph 376, and, after the limited number of replicas or reproductions provided in paragraph 652 had been given free entry, further copies, replicas, or reproductions thereof would be classifiable under paragraph 376. \* \* \*

The statement was obiter in that case, of course, but it is an interesting suggestion as to a possible construction of paragraph 1547 (a) now in force.

It was said there, in substance, that the essential qualification, as defined in paragraph 652, that the original sculpture must be of a quality entitling it to rank as a work of art had not been removed by the enactment of paragraph 376. In other words, copies, replicas, or reproductions of the sculptures included in paragraph 652 (additional to the two for which free entry was provided) to obtain the duty rate provided in paragraph 1547 (a) must be the work of professionals. That is an entirely reasonable construction, but it is our view that it was not intended thereby to hold that copies, etc. of figurines, which figurines are themselves the work of professional sculptors, also must be the work of professionals. The fundamental reason for the rule with respect to the free fine arts does not exist in the case of the commercial products covered by paragraph 1547 (a), *supra*.

We entertain no doubt as to the witnesses Harridane and Daws being professional sculptors, and we experience no difficulty in agreeing with the trial court's conclusion that the original figurines modeled by them for Doulton & Co., Ltd. were sculptures within the common, ordinary meaning of that term.

We fully realize that not everything modeled by a sculptor thereby becomes a sculpture, or a work of art, within the common meaning of the terms, which, in the absence of defining phraseology, is also the statutory meaning, and we have given careful study to the arguments of counsel for the Government, in the light of the numerous decisions which they cite, against holding the originals in this case to have been sculptures, but we are not convinced of the soundness of their position.

The fact that suggestions as to subject matter to be represented by the figurines were made at times to the sculptors by the art director of Doulton & Co., Ltd., does not, in our opinion, detract from the originality of the sculptor's work.

For example, the witness Daws evidently was familiar with many types of dogs, and if the art director ordered the figure of, say, a Cocker Spaniel in a certain position he modeled one from his own knowledge and observation of the breed and its motions and appearance, or perhaps from life. On the same basis, the witness Harradine in forming his diminutive figures of persons, we think, did original work even when he was carrying out general suggestions made to him.

We have not commented upon the work of those who painted the articles because the primary interest here revolves about the sculpture. The evidence is clear, however, that a high order of skill is displayed in the decoration of the figurines.

We have studied the evidence of the expert witnesses called on behalf of the Government whose testimony was to the effect that the involved figurines are not works of art. We think it evident that they

approached the subject as artists—we do not question their ability as such—rather than from the standpoint of congressional intent in the matter of levying tariff duties.

The Congress did not create the new law embraced in paragraph 376 of the 1913 tariff act idly, nor has it been retained idly. The amendment as to valuation adopted by the Congress which passed the 1930 Act is believed to have a significance which aids in interpreting the paragraph. That phraseology has not been considered by us previously.

The Congress obviously intended that some forms of statuary and sculpture and copies, replicas, or reproductions of same should be classifiable under paragraph 1547 (a), *supra*. If figurines, such as those here involved, are held not to be so classifiable, it seems to us the paragraph will be greatly mutilated even if not wholly emasculated.

No identification of originals as distinguished from copies is made among the figurines here involved, nor in the protest. So, upon the record, all should pay duty at the rate of 20 per centum ad valorem.

For the reasons stated, the judgment of the United States Customs Court is *reversed* and the case is *remanded* for further proceedings in conformity with this decision.